J-S18042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.J.I., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.J.I., SR., FATHER, AND B.L.N.I., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 116 WDA 2025 |

Appeal from the Decree Entered January 2, 2025
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
2023-00060A

| | | |
|---|---|---|
| IN THE INTEREST OF: P.A.I., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.J.I., SR., FATHER AND B.L.N.I., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 117 WDA 2025 |

Appeal from the Decree Entered January 2, 2025
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
2023-00061A

| | | |
|---|---|---|
| IN THE INTEREST OF:  L.L.I., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  B.J.I., SR., FATHER AND B.L.N.I., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 118 WDA 2025 |

Appeal from the Decree Entered January 2, 2025
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
2023-00062A

| | | |
|---|---|---|
| IN THE INTEREST OF:  B.G.I., A/K/A N.I., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

:
:
:
APPEAL OF: B.J.I., SR., FATHER AND : 
B.L.N.I., MOTHER :
:
:
:
:   No. 119 WDA 2025

Appeal from the Decree Entered January 2, 2025
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
2023-00063A

| IN THE INTEREST OF: N.J.I., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|

IN THE INTEREST OF: N.J.I., A :   IN THE SUPERIOR COURT OF
MINOR :       PENNSYLVANIA
:
:
:
APPEAL OF: B.J.I., SR., FATHER AND :
B.L.N.I., MOTHER :
:
:
:
:   No. 120 WDA 2025

Appeal from the Decree Entered January 2, 2025
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
2023-00064A

BEFORE:   DUBOW, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:       **FILED: July 3, 2025**

In these consolidated joint appeals, B.J.L., Sr. ("Father") and B.L.N.I. ("Mother") (collectively, "Parents"), appeal from the January 2, 2025 decrees granting the petitions filed by Appellee, the Butler County Children and Youth Services ("CYS"), to involuntarily terminate Parents' parental rights to their five minor children, B.J.I., Jr. (born in March 2013), P.I. (born in February

_____

[*] Former Justice specially assigned to the Superior Court.

- 2 -

2015), L.L.I. (born in July 2017), N.I.I. (born in July 2019), and N.J.I. (born in March 2022) (collectively, "Children"), pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). After careful review, we affirm.

The orphans' court summarized the extensive factual findings and procedural history of this case as follows:

> On July 1, 2019, Mother gave birth in her home to N.I.I. The newborn was subsequently transferred to Magee Women's Hospital in Pittsburgh. On the following day, [CYS] received information the newborn tested positive for cocaine and methadone. [CYS] Caseworkers and two (2) Butler County Adult Probation Officers conducted a home inspection. They discovered there was no electricity serving the residence. Mother and Father admitted using cocaine three (3) days prior to Mother's delivery of N.I.I. The Probation Officers also found various medications, a loaded gun, crushed up pills, and drug paraphernalia, all within reach of the Parties' other children. Mother and Father were incarcerated in the Butler County Prison for violating the terms of their respective probations terms by possessing the loaded gun. The Detention Order issued on July 3, 2019, followed the same day by a Shelter Care hearing. Upon the recommendation by the Juvenile Court Hearing Officer, the Court directed the Children be detained to protect their health, safety, and welfare. Dependency petitions were also filed for the Child's three (3) older siblings. The newborn, N.J.I., was hospitalized from July 1 through July 19, 2019, due to cocaine addiction.
>
> The Adjudication hearing was scheduled on July 18, 2019, and, due to the unavailability of Mother's court-appointed attorney, continued and rescheduled on July 24, 2019[], at which time an order was entered adjudicating the four (4) Children dependent. At this hearing, Mother and Father admitted using illegal drugs. The Children placed with their Paternal Aunt [] whose boyfriend, "Richard," had a felony conviction from 20 years prior. Because of Richard's criminal

record, [CYS] was unable to obtain certification of Paternal Aunt's home, as an appropriate placement option. However, the Children remained placed in her home because [CYS] believed it was in their best interests ….

Mother and Father remained incarcerated at the time of the Disposition hearing held on August 22, 2019. The Court entered an order maintaining the Children's placement with the Paternal Aunt. The Disposition Order further directed Mother and Father to contact [CYS] immediately upon release from incarceration, to participate in any parenting programs available through the Butler County Prison, and to maintain contact with their children by sending cards and letters to [CYS's] assigned caseworker, who would forward all correspondence to the four (4) children.

The initial Permanency Review Hearing ("PRH") was scheduled on September 4, 2019, but continued by consent order, due to a conflict of interest involving Father's court-appointed attorney. Upon motion by [CYS], the Court granted its request for an early PRH based upon certain safety concerns existing in Paternal Aunt's home. This hearing was held before the Hearing Officer on October 9, 2019.

At the early PRH, Mother was no longer incarcerated. Father remained in the Butler County Prison. The Court determined, upon recommendation by the Hearing Officer, that both Parents were minimally complying with the Children's Permanency Plans ("CPP"); Mother's progress toward alleviating the circumstance necessitating the original placement was minimal, since released from incarceration, and Father made no progress. The placement goal was reunification of the Children with a parent or guardian with adoption as the concurrent plan.

A PRH was held before the Hearing Officer approximately a month later on November 14, 2019. Despite being incarcerated, Father demonstrated moderate compliance with the provisions under the Permanency Plan. However, he was not making

- 4 -

progress toward relieving the dependency circumstances, although Father completed a drug and alcohol evaluation recommending inpatient treatment. Mother was progressing toward certain goals. She consistently tested negative for illegal substances, obtained employment, obtained housing in an addiction rehabilitation home, and attended appropriate treatment. Therapeutic visitations with Mother were recommended, due to the Children's behavioral concerns. The permanency goal remained reunification with Mother and Father.

At the PRH held February 6, 2020, the Hearing Officer determined both parents were substantially complying with the CPP's. Father was no longer incarcerated. Mother and Father obtained housing under a one (1) year lease. They consistently attended therapeutic visitation with the Children. However, neither parent was involved with mental health services. Mother's progress remained moderate. She cooperated with drug screening, which revealed her ongoing use of marijuana. Mother successfully completed intensive outpatient treatment at the Gaiser Center and transferred to the facility's stepped-down outpatient program. However, Mother's attendance in outpatient was poor. On January 23, 2020, she tested positive for amphetamines, no longer worked, and was not receiving mental health services.

Father was achieving moderate progress toward attaining the goals outlined by [CYS]. He attended inpatient drug and alcohol treatment at Conewago Indiana, and underwent a drug and alcohol evaluation at the Gaiser Center, which recommended **_intensive_** outpatient treatment. Due to scheduling issues, Father [] decided to participate in intensive outpatient treatment at Butler Memorial. However, Father tested positive for THC and amphetamines on two (2) occasions. The Children's continued placement with the Paternal Aunt was found to be in their best interests.

The next PRH scheduled on April 30, 2020 was continued to July 23, 2020, due to circumstances

- 5 -

surrounding the COVID pandemic. Upon the Hearing Officer's recommendation, the Court maintained Children's placement with Paternal Aunt. Mother and Father were making minimal progress toward alleviating the circumstance which necessitated the original placement. They were inconsistent participating with the services being offered, including drug screening. Of the 45 scheduled drug screens for Mother and Father from January 2, 2020 to July 16, 2020, both Parents tested negative only four (4) times in January of 2020. They had positive results for using THC and other substances on ten (10) occasions. Mother and Father failed to appear for drug screening on 27 occasions, during this roughly six-and one-half-month period.

On April 25, 2020, the Butler City Police and emergency medical personnel responded to the home of Mother and Father for a reported drug overdose. Upon arrival, the EMS personnel found Mother lying unresponsive inside the doorway of the home. She was successfully administered a dose of Naloxone and Mother became responsive. In early July 2020, Mother and Father were facing new criminal charges arising from separate incidents involving trespassing and theft at Walmart. Therapeutic visitation with the Children occurred at Family Pathways, but Mother and Father attended only 24 of 49 scheduled sessions from January 2 through July 16, 2020. During these visits, they were dismissive and argumentative with the Family Pathways therapists, such as using intimidating language toward the Children, including threats to remove food, shelter, and security. Mother and Father resisted improving their parenting style.

By Order dated October 14, 2020 upon the Hearing Officer's Recommendation following another PRH, the Court continued placement of the Children. Mother and Father were discharged from therapeutic visitation services by Family Pathways on September 10, 2020, for numerous concerns regarding their tone of voice, angry and threatening demeanor, name-calling, and taking the Children away from the visitation supervisor to speak privately with them.

Supervised visitation resumed September 22, 2020 with another provider, Justice Works. Additional findings at the PRH include Mother and Father failing to pay rent and utilities. Both Parents were involved with service providers, although they had inconsistent drug screens. Mother and Father obtained prescription medical marijuana cards and continued testing positive for THC. The criminal charges arising from the incidents in early July 2020 remained pending and Father continued to be on probation. Placement and physical custody of the Children remained with Paternal Aunt. Visitation was modified to in-home supervision twice a week for two (2) hours each session. Both Parents were moderately complying with the Permanency Plan and were making moderate progress toward alleviating the circumstances necessitating the original placement.

At the next PRH held December 3, 2020, the Hearing Officer issued detailed Supplemental Findings in support of the recommendation to return the Children to Mother and Father. The visitation provider, Justice Works, observed no safety concerns regarding the care Mother and Father were providing to their children and the Parents were making substantial progress, both toward alleviating the circumstances which necessitated the original placement and complying with [CYS'] Permanency Plan. Both Parents complied with drug and alcohol treatment and participated in mental health counseling. Their delinquent rent was nearly current. Mother obtained employment, while Father was receiving monthly Social Security Disability income. Over [CYS'] objection, the Hearing Officer's Recommendation was adopted by Order of Court on December 3, 2020, directing the immediate return of the Children to Mother and Father. A PRH (Non-Placement) was scheduled on January 21, 2021.

At this PRH (Non-Placement), the Hearing Officer determined Mother was neither attending any drug and alcohol sessions at the Care Center nor participating in mental health counseling, since the Children were returned home. She missed many in-

home drug screens, but tested negative for those screens she took. Father was discharged January 12, 2021 from drug and alcohol treatment because he was not attending. He was at risk of being discharged from mental health services, having only attended one (1) session. Mother and Father faced eviction from their home, due to non-payment of rent. They refused assistance from Justice Works to find suitable housing. The Hearing Officer's Recommendation dated January 21, 2021, as adopted by Order issued February 4, 2021, states:

> Although there are no current safety concerns in the home, there are numerous concerns regarding the Parents' cooperating with services and the stability of their housing. In addition, there are concerns regarding the children's behaviors and not attending school. Although the concerns do not justify removal of the children at this time, the matter will continue to remain open with the Court and [CYS] until such time as it can be determined that the parents have addressed the housing issue, have addressed their financial issues, have continued with drug and alcohol and mental health treatment, have been consistent with drug screens, have addressed the children's behaviors, are getting the children to school on time every day, and are cooperative with [CYS] and Justice Works.

The next PRH (Non-Placement) scheduled March 3, 2021 was rescheduled to March 18, 2021.

On March 18, 2021, the Hearing Officer found Mother and Father were discharged from both drug and alcohol treatment and mental health counseling for failure to attend. Housing was a serious concern. A landlord-tenant civil proceeding was scheduled on April 7, 2021. There were difficulties with the school-aged children's attendance. Despite these concerns, the Children remained in the home with Justice Works providing the services directed by [CYS].

At the July 1, 2021 PRH, the Hearing Officer recommended terminating court supervision of the Children because Mother and Father obtained adequate housing, rent was current, and they consistently had negative drug screens. The Children's school attendance was improving, as well.

In January 2022, the Agency received a report Mother and Father may be living with the Children at a local motel. There were also concerns about a possible physical alternation between Mother and Father. [CYS] Caseworker[] Amy McGill[] confirmed the family was living in a motel and searching for appropriate housing: Ms. McGill testified Children's needs were being met, despite living in the motel, and Mother and Father were seeking housing support from the community. The youngest of the five (5) siblings was born March 10, 2022. A week later on March 17, 2022, there was a CPS report one (1) of the Children sustained an eye injury. Mother and Father reported the oldest Child fell off his bike. Upon investigation, [CYS] determined the CPS report unfounded.

Later in 2022, there was another CPS report concerning N.I. losing too much weight and another younger sibling, L.I., presenting at the local Head Start childcare facility with a Suboxone wrapper in her backpack. Mother and Father said N.I.'s stomach illness and vomiting were the cause of his weight loss. After investigating [CYS] concluded the Suboxone wrapper incident was valid, despite Mother and Father asserting they utilized a lockbox in their home for safekeeping medications.

On July 11, 2022, [CYS], again, became involved with the family when the Adams Township (Butler County) Police Department contacted [CYS] concerning [] three (3) of the Children left unattended in the residence. The Officers determined these children were left alone for approximately two (2) hours without any adult or appropriate caregiver present. Adams Township Officer Jose Ceron testified it took Mother and Father over one (1) hour for them to return home, after a child, B.I. called his parents to

inform them the police were at the residence. However, when he was on the phone with Mother and Father, they told their son they were, "...turning on the street now." Officer Ceron smelled marijuana within the home, along with finding suspected marijuana found within reach of the Children. The police took Father into custody, while [CYS] placed the Children with the Maternal Great-Grandmother[.] Mother and Father were charged with felony endangering the welfare of children. A search warrant was issued and, upon searching the vehicle after it arrived home, the police discovered several prescription bottles with one (1) bottle containing evidence of crack cocaine. The investigating officers also determined there was inadequate food in the home.

On the following day, an order detaining the Children was entered, due to these safety concerns, including, but not limited to the unavailability of Mother and Father. On July 13, 2022, [CYS] filed the Petition for Dependency and application for shelter care. Sufficient evidence was presented to establish a return of the Children to their home with Mother and Father was unsafe. [A h]earing on [CYS's] Petition was scheduled on July 27, 2022. Prior to the hearing, [CYS] filed an Amended Dependency Petition, addressing additional concerns, such as the older Children's poor school attendance and insufficient health care.

Prior to the July 11, 2022 incident involving the police, one (1) of the Children, N.I., was having breathing difficulties and weight gain issues. Mother and Father were advised to take him to Children's Hospital of Pittsburgh, which they failed to do. The following day, N.I. was transported by ambulance and admitted to Children's Hospital. Mother and Father later signed out the boy from the hospital against medical advice. The health issues involving N.I. later resolved. However, all of the Children missed various health care appointments. For example, the [CYS] assigned Caseworker attempted to have authorizations signed by Mother and Father to release dental care

- 10 -

information. Mother informed the Caseworker there was no identified dental provider for the Children.

Mother and Father arrived approximately 20-25 minutes late to the Detention hearing held on July 27, 2022. Counsel for Mother and Father requested a full evidentiary hearing regarding the dependency allegations. Due to the Hearing Officer's schedule, there was insufficient time to conduct a lengthy hearing, so it was rescheduled to August 12, 2022. However, some testimony was received on July 27, 2022, regarding [CYS's] request to modify the Children's placement. [CYS] alleged Mother, who was required to be supervised with the Children, was unsupervised, when she took the Children to a medical appointment. There were additional safety concerns how the Children and Mother were transported to the appointment. Placement of the Children was modified by removing them from Maternal Great-Grandmother's care and placing the Children into foster care.

At the August 17, 2022, Adjudication hearing, the evidence established Father faced three (3) felony child endangering charges and five (5) misdemeanors arising from the July 11, 2022 incident. Soon thereafter, he was also charged for a somewhat related incident occurring on August 8, 2022, comprised of two (2) felonies and two (2) misdemeanors, where Father threatened a neighbor near the apartment rented by the Mother and Father. Mother was charged with two (2) felony endangering charges, three (3) misdemeanors, and a summary offense arising from the incident on July 11, 2022. Father was incarcerated in the Butler County Prison with bail set at $100,000.00. At the Disposition hearing held September 14, 2022, the continued placement of the Children was ordered with Mother entitled to supervised visitation twice a week, since she was not incarcerated. Father was granted visitation, contingent upon his release from jail. … On or about November 1, 2022, the Agency requested a placement change to allow all five (5) children to remain together in foster care.

At the December 14, 2022 PRH, it was determined continued placement of the Children was in their best interests. Father remained incarcerated. On the other hand, Mother was making moderate progress toward alleviating the circumstances necessitating the original placement. She maintained a residence in the Adams Ridge development located in southern Butler County and was able to drive a suitable vehicle for transporting the Children. Mother was also working fulltime. An early PRH was scheduled for February 2, 2023.

. . . .

At the March 8, 2023, PRH, the evidence supported continuing placement of the Children in Foster care. Father remained incarcerated. Mother was deemed to be substantially complying with the goals outlined by [CYS]. Another review hearing was scheduled on March 24, 2023.

The [CYS] Caseworker conducted a home visit on March 15, 2023 and was informed by one (1) of the Children that an individual known as "Uncle Miz" had "grabbed up on him." At the time, Mother had unsupervised custody of the Children at Maternal Grandmother's home every weekend. Mother claimed she does not allow anyone around the Children. Upon further inquiry, [CYS] discovered "Uncle Miz" … was under close surveillance by Federal Marshalls. On or about April 12, 2023, [CYS] petitioned for an early review hearing, due to concerns with some adult being around the Children, during Mother's visitation.

At the early PRH held April 27, 2023, the evidence indicated Mother was exercising poor judgment with certain adults she allowed to be in contact with the Children. Mother was prohibited to have anyone be in her home when having overnight visitation of the Children, unless [CYS] gave approval after it conducted criminal background checks. The next PRH was scheduled on June 28, 2023.

- 12 -

On June 7, 2023, one (1) of the Children requested that, "Terrance[] [Clowney] wouldn't come around anymore." [CYS] determined Federal Marshalls were also searching for Mr. Clowney because a warrant was issued for his arrest. Mr. Clowney frequented Mother's residence on several occasions. He was apprehended to face drug-related charges.

Later in June 2023, the Butler County Drug Task Force arrested and charged Mother with felony drug charges involving fentanyl distribution, as well as a misdemeanor drug paraphernalia charge. Maternal Great-Grandmother, who previously served as kinship placement for the Children was present during some of Mother's drug dealing. A search warrant of Mother's cellphone further revealed Maternal Great-Grandmother was fully aware of Mother's illegal drug activity. The search of Mother's cellphone also revealed an incident of a third-party trying to buy a bundle of fentanyl from Mother on June 28, 2023. Mother['s] text message reply stated, "give me a second I have my kids."

At the PRH held July 19, 2023, Father remained incarcerated. Mother tested positive for cocaine and continued her association with known drug-related persons. Mother underwent ongoing drug screens twice per week and hair follicle testing. Mother's court-appointed attorney requested a continuance of the October 11, 2023, PRH, because she had a previously scheduled vacation, but then fell ill with COVID-19. An Order granting the continuance request was entered and the PRH was re-rescheduled to October 26, 2023.

Father was still incarcerated at the time of the October 26, 2023[] PRH. Mother was minimally complying with the Children's Permanency Plans. She was not communicating with [CYS] and also had outstanding criminal warrants. The Children remained placed in Foster care.

Orphans' court opinion, 1/2/25 at 1-13 (some footnotes omitted).

On October 25, 2023, CYS filed petitions to involuntarily terminate Parents' parental rights to the Children, pursuant to Sections §§ 2511(a)(1), (2), (5), (8) and (b). Thereafter, on February 2, 2024, CYS filed a motion for goal change from reunification to adoption. The orphans' court conducted an evidentiary hearing on the termination petitions on April 24, 25, and 26, 2024. Parents were both incarcerated at the time of the termination proceedings but were represented by counsel. The Children's court-appointed **guardian ad litem**, Susan B. Lope, Esq., was also present at the termination hearing.

As noted, on January 2, 2025, the orphans' court entered decrees, finding that CYS satisfied its burden of proving by clear and convincing evidence that the termination of Parents' parental rights to the Children was warranted under Sections 2511(a)(1), (2), (5) and (8), and that termination was in the best interest of the Children. Orphans' court opinion, 1/2/25 at 33; **see also** Decrees, 1/2/25 at 1. Parents filed timely notices of appeal on January 29, 2025.[1] Parents and the orphans' court have complied with Pa.R.A.P. 1925.

_____

[1] We note that although each notice of appeal states that Parents are appealing from the "Order" entered in each case, each notice of appeal actually appears to relate to two decrees that separately terminated Mother's and Father's parental rights to each child. The joint appeals filed by Father and Mother at Nos. 116 WDA 2025, 117 WDA 2025, 118 WDA 2025, 119 WDA 2025, and 120 WDA 2025 were consolidated by **per curiam** order of this Court on February 20, 2025.

Parents raise the following issues for our review:

  I.   Did the [orphans' court] commit an abuse of discretion in finding by clear and convincing evidence that both parents, who are married to each other, displayed conduct continuing for a period of at least six (6) months immediately preceding the filing of the Petition for Involuntary Termination of Parental Rights which evidenced a settled purpose of relinquishing their parental claim to the child when the testimony at trial was that when Father was permitted visits he attended them faithfully, attempted to send the children cards and letters, was involved in numerous groups to assist him in meeting the goals in the child's permanency plans, the children were bonded to him and was set to be released from prison in June of 2024 and off supervised release by August 2025[?]

  II.  Did the [orphans' court] commit an abuse of discretion in finding that there was clear and convincing evidence the natural parents could not or would not remedy the conditions that led to removal of the child within a reasonable period of time and that the services available are not likely to remedy the conditions which led to placement when the parents had actively engaged services when able and Father had addressed the issues that caused his incarceration and his release from incarceration was eminent[?]

  III. Did the [orphans' court] commit an abuse of discretion in failing to address the bond between the children and their parents and the impact of the termination of [P]arents' rights on the children[?]

Parents' brief at 7.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and internal quotation marks omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re B.J.Z.*, 207 A.3d 914, 921 (Pa.Super. 2019) (citation omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009). This Court has defined "clear and convincing evidence" as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (citation and quotation marks omitted).

In this case, termination of Parents' parental rights to the Children was sought pursuant to Sections 2511(a)(1), (2), (5), (8) and (b), which provide as follows:

**§ 2511.  Grounds for involuntary termination**

**(a)  General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

> (2)   The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> (5)   The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> . . . .
>
> (8)   The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental

> rights would best serve the needs
> and welfare of the child.
>
> **. . . .**
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Instantly, Parents contend that CYS failed to prove by clear and convincing evidence that they demonstrated a settled purpose of relinquishing their parental claim to the Children and has failed to perform their parental duties for a period of at least six months prior to their filing of the termination petition. Parents' brief at 15-24. Parents further contend that that the orphans' court erred in its evaluation under Section 2511(b). *Id.* at 25-30.

An inquiry under subsection 2511(a)(1) focusses on the conduct of the parent for at least a six-month period prior to the filing of the petition. "A

court may terminate parental rights under subsection 2511(a)(1) when the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the filing of the termination petition." *In re I.J.*, 972 A.2d 5, 10 (Pa.Super. 2009).

> Though we do not adhere to any strict definition of parental duty, a child has a right to essential parental care, and our jurisprudence reveals certain irreducible qualities of a parent's attendant obligation. Foremost, it is a positive duty requiring affirmative performance. [C]ommunication and association are essential to the performance of parental duty[.] [P]arental duty requires that a parent exert himself to take and maintain a place of importance in the child's life. A parent must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship, or his rights may be forfeited. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Adoption of C.M.*, 255 A.3d 343, 364 (Pa. 2021) (internal citations and quotation marks omitted).

Likewise, under Section 2511(b), trial courts are required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The "emotional needs and welfare" analysis under Section 2511(b) should include, in part, a child's bond with his or her parent. In doing so, trial courts must examine the effect on the child of severing such a bond, and this includes "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and

emotional needs and welfare." ***In the Interest of K.T.***, 296 A.3d 1085, 1113 (Pa. 2023).

Following a thorough review of the record, including the briefs of the parties, the applicable law, and the well-reasoned January 2, 2025 opinion of the orphans' court, it is our determination that Parents' claims warrant no relief. The orphans' court comprehensively discussed each of Parents' claims on appeal and concluded that they were without merit. We find that the conclusions of the orphans' court are supported by competent evidence and are clearly free of legal error.

Specifically, we agree with the orphans' court's determination that CYS established by clear and convincing evidence that the involuntary termination of Mother's and Father's parental rights was warranted under Sections 2511(a)(1). ***See*** Orphans' court opinion, 1/2/25 at 14-22, 24-26. We further agree with the orphans' court's rationale that the termination of Parents' parental rights would best serve the developmental, physical and emotional needs and welfare of Children. ***See id.*** at 31-33. Contrary to Parents' claim, it is clear that the orphans' court considered the bond the Children had with Parents, noting that "[t]he Children's need for safety, stability, and permanency clearly outweigh any potential harm to the Children from the severing their bond with Mother and Father." ***Id.*** at 32.

Our standard of review requires us to accept the findings of fact and credibility determinations of the orphans' court where, as here, they are

supported by the record. ***See In re T.S.M.***, 71 A.3d at 267. Based on the foregoing, we find that the orphans' court did not abuse its discretion in granting CYS's petition to involuntarily terminate Parents' parental rights to the Children. Accordingly, we adopt the comprehensive and well-reasoned January 2, 2025 opinion of the Honorable William C. Robinson, Jr. as our own for purposes of this appellate review.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/3/2025

**IN THE COURT OF COMMON PLEAS OF BUTLER COUNTY, PENNSYLVANIA**
**ORPHANS' COURT DIVISION**

IN RE:  ADOPTION OF                     :          O.A. No. 60 of 2023

█████████████████████████        :

      **a Minor.**                              :

DEC 31 2024 AM 11:39
REC'D ROW & OC BUTLER COUNTY F

Robinson, Jr., J.                                         Date:  **December 30, 2024**
_____

**FINDINGS of FACT and OPINION**

**Dependency Findings**

A two (2) and one-half day hearing was held April 24, 25, and 26, 2024 on the Petitions for Involuntary Termination of Parental Rights (IVT) filed October 25, 2023 by the Butler County Children and Youth Services ("Agency") against ████████████████("Father") and ████████ █████("Mother"). Both Parents appeared and were represented by counsel. Mother and Father are the natural parents of the following five (5) minor children: B. J. I., Jr. age 14 (██████████████ P. I., age 9 (██████████ L. L. I., age 7 (█████████); N. I. I., a.k.a Baby Girl, age 5 (██████████, and N. J. I., age 2 (█████████ ("Children"), all of whom are adjudicated dependent. The Children's court-appointed Guardian *ad litem* ("GAL") appeared on their behalf.[1] Also pending is the Agency's Motion for Goal Change filed at the Dependency action (D. P. No. 9 of 2016).

The grounds alleged by the Agency for involuntarily terminating the parental rights under 23 Pa. C.S. §2511(a) are, as follows: (a)(1); (a)(2); (a)(5); and (a)(8).

On July 1, 2019, Mother gave birth in her home to N. I. I. The newborn was subsequently transferred to Magee Women's Hospital in Pittsburgh. On the following day, the Agency received

---

[1] This Court finds no conflict of interest exists Susan B. Lope, Esq. serving as the Guardian *ad litem* in the respective Dependency action and as counsel for the Children in the matter *sub judice*. This Court further finds the Children are each unable to both fully comprehend the true depth of "permanency" and articulate a reasonable preference.

information the newborn tested positive for cocaine and methadone. The Agency's Caseworkers and two (2) Butler County Adult Probation Officers conducted a home inspection. They discovered there was no electricity serving the residence. Mother and Father admitted using cocaine three (3) days prior to Mother's delivery of N. I. I. The Probation Officers also found various medications, a loaded gun, crushed up pills, and drug paraphernalia, all within reach of the Parties' other children. Mother and Father were incarcerated in the Butler County Prison for violating the terms of their respective probations terms by possessing the loaded gun. The Detention Order issued on July 3, 2019, followed the same day by a Shelter Care hearing. Upon the recommendation by the Juvenile Court Hearing Officer, the Court directed the Children be detained to protect their health, safety, and welfare. Dependency petitions were also filed for the Child's three (3) older siblings.[2] The newborn, N. J. I., was hospitalized from July 1 through July 19, 2019, due to cocaine addiction.

The Adjudication hearing was scheduled on July 18, 2019, and, due to the unavailability of Mother's court-appointed attorney, continued and rescheduled on July 24, 2019., at which time an order was entered adjudicating the four (4) Children dependent. At this hearing, Mother and Father admitted using illegal drugs. The Children placed with their Paternal Aunt, ████████████ whose boyfriend, "Richard," had a felony conviction from 20 years prior. Because of Richard's criminal record, the Agency was unable to obtain certification of Paternal Aunt's home, as an appropriate placement option. However, the Children remained placed in her home because the Agency believed it was in their best interests, the lack of proper certification.

Mother and Father remained incarcerated at the time of the Disposition hearing held on August 22, 2019. The Court entered an order maintaining the Children's placement with the

---

[2] The youngest child, N.I.I., was born nearly three (3) years later on ████████████

Paternal Aunt. The Disposition Order further directed Mother and Father to contact the Agency immediately upon release from incarceration, to participate in any parenting programs available through the Butler County Prison, and to maintain contact with their children by sending cards and letters to the Agency's assigned caseworker, who would forward all correspondence to the four (4) children.

The initial Permanency Review Hearing (PRH) was scheduled on September 4, 2019, but continued by consent order, due to a conflict of interest involving Father's court-appointed attorney. Upon motion by the Agency, the Court granted its request for an early PRH based upon certain safety concerns existing in Paternal Aunt's home. This hearing was held before the Hearing Officer on October 9, 2019.

At the early PRH, Mother was no longer incarcerated. Father remained in the Butler County Prison. The Court determined, upon recommendation by the Hearing Officer, that both Parents were minimally complying with the Children's Permanency Plans (CPP); Mother's progress toward alleviating the circumstance necessitating the original placement was minimal, since released from incarceration, and Father made no progress. The placement goal was reunification of the Children with a parent or guardian with adoption as the concurrent plan.

A PRH was held before the Hearing Officer approximately a month later on November 14, 2019. Despite being incarcerated, Father demonstrated moderate compliance with the provisions under the Permanency Plan. However, he was not making progress toward relieving the dependency circumstances, although Father completed a drug and alcohol evaluation recommending inpatient treatment. Mother was progressing toward certain goals. She consistently tested negative for illegal substances, obtained employment, obtained housing in an addiction rehabilitation home, and attended appropriate treatment. Therapeutic visitations with

3

Mother were recommended, due to the Children's behavioral concerns. The permanency goal remained reunification with Mother and Father.

At the PRH held February 6, 2020, the Hearing Officer determined both parents were substantially complying with the CPP's. Father was no longer incarcerated. Mother and Father obtained housing under a one (1) year lease. They consistently attended therapeutic visitation with the Children. However, neither parent was involved with mental health services. Mother's progress remained moderate. She cooperated with drug screening, which revealed her ongoing use of marijuana. Mother successfully completed intensive outpatient treatment at the Gaiser Center and transferred to the facility's stepped-down outpatient program. However, Mother's attendance in outpatient was poor. On January 23, 2020, she tested positive for amphetamines, no longer worked, and was not receiving mental health services.

. Father was achieving moderate progress toward attaining the goals outlined by the Agency. He attended inpatient drug and alcohol treatment at Conewago Indiana, and underwent a drug and alcohol evaluation at the Gaiser Center, which recommended intensive outpatient treatment. Due to scheduling issues, Father opted decided to participate in *intensive* outpatient treatment at Butler Memorial. However, Father tested positive for THC and amphetamines on two (2) occasions. The Children's continued placement with the Paternal Aunt was found to be in their best interests. [3]

The next PRH scheduled on April 30, 2020 was continued to July 23, 2020, due to circumstances surrounding the COVID pandemic. Upon the Hearing Officer's recommendation, the Court maintained Children's placement with Paternal Aunt. Mother and Father were making

---

[3] The PRH Orders dated November 14, 2019 and February 6, 2020 were amended by PRH Order – Amended, docketed on April 9, 2020 to properly reflect the Agency had legal custody of the Children with the Paternal Aunt continuing with physical custody.

4

minimal progress toward alleviating the circumstance which necessitated the original placement. They were inconsistent participating with the services being offered, including drug screening. Of the 45 scheduled drug screens for Mother and Father from January 2, 2020 to July 16, 2020, both Parents tested negative only four (4) times in January of 2020. They had positive results for using THC and other substances on ten (10) occasions. Mother and Father failed to appear for drug screening on 27 occasions, during this roughly six- and one-half-month period.

On April 25, 2020, the Butler City Police and emergency medical personnel responded to the home of Mother and Father for a reported drug overdose. Upon arrival, the EMS personnel found Mother lying unresponsive inside the doorway of the home. She was successfully administered a dose of Naloxone and Mother became responsive. In early July 2020, Mother and Father were facing new criminal charges arising from separate incidents involving trespassing and theft at Walmart. Therapeutic visitation with the Children occurred at Family Pathways, but Mother and Father attended only 24 of 49 scheduled sessions from January 2 through July 16, 2020. During these visits, they were dismissive and argumentative with the Family Pathways therapists, such as using intimidating language toward the Children, including threats to remove food, shelter, and security. Mother and Father resisted improving their parenting style.

By Order dated October 14, 2020 upon the Hearing Officer's Recommendation following another PRH, the Court continued placement of the Children. Mother and Father were discharged from therapeutic visitation services by Family Pathways on September 10, 2020, for numerous concerns regarding their tone of voice, angry and threatening demeanor, name-calling, and taking the Children away from the visitation supervisor to speak privately with them. Supervised visitation resumed September 22, 2020 with another provider, Justice Works. Additional findings at the PRH include Mother and Father failing to pay rent and utilities. Both Parents were involved

5

with service providers, although they had inconsistent drug screens. Mother and Father obtained prescription medical marijuana cards and continued testing positive for THC. The criminal charges arising from the incidents in early July 2020 remained pending and Father continued to be on probation. Placement and physical custody of the Children remained with Paternal Aunt. Visitation was modified to in-home supervision twice a week for two (2) hours each session. Both Parents were moderately complying with the Permanency Plan and were making moderate progress toward alleviating the circumstances necessitating the original placement.

At the next PRH held December 3, 2020, the Hearing Officer issued detailed Supplemental Findings in support of the recommendation to return the Children to Mother and Father. The visitation provider, Justice Works, observed no safety concerns regarding the care Mother and Father were providing to their children and the Parents were making substantial progress, both toward alleviating the circumstances which necessitated the original placement and complying with the Agency's Permanency Plan. Both Parents complied with drug and alcohol treatment and participated in mental health counseling. Their delinquent rent was nearly current. Mother obtained employment, while Father was receiving monthly Social Security Disability income. Over the Agency's objection, the Hearing Officer's Recommendation was adopted by Order of Court on December 3, 2020, directing the immediate return of the Children to Mother and Father. A PRH (Non-Placement) was scheduled on January 21, 2021.

At this PRH (Non-Placement), the Hearing Officer determined Mother was neither attending any drug and alcohol sessions at the Care Center nor participating in mental health counseling, since the Children were returned home. She missed many in-home drug screens, but tested negative for those screens she took. Father was discharged January 12, 2021 from drug and alcohol treatment because he was not attending. He was at risk of being discharged from mental

6

health services, having only attended one (1) session. Mother and Father faced eviction from their home, due to non-payment of rent. They refused assistance from Justice Works to find suitable housing. The Hearing Officer's Recommendation dated January 21, 2021, as adopted by Order issued February 4, 2021, states:

> Although there are no current safety concerns in the home, there are numerous concerns regarding the Parents' cooperating with services and the stability of their housing. In addition, there are concerns regarding the children's behaviors and not attending school. Although the concerns do not justify removal of the children at this time, the matter will continue to remain open with the Court and the CYS Agency until such time as it can be determined that the parents have addressed the housing issue, have addressed their financial issues, have continued with drug and alcohol and mental health treatment, have been consistent with drug screens, have addressed the children's behaviors, are getting the children to school on time every day, and are cooperative with the Agency and Justice Works.

The next PRH (Non-Placement) scheduled March 3, 2021 was rescheduled to March 18, 2021.

On March 18, 2021, the Hearing Officer found Mother and Father were discharged from both drug and alcohol treatment and mental health counseling for failure to attend. Housing was a serious concern. A landlord-tenant civil proceeding was scheduled on April 7, 2021. There were difficulties with the school-aged children's attendance. Despite these concerns, the Children remained in the home with Justice Works providing the services directed by the Agency.

At the July 1, 2021 PRH, the Hearing Officer recommended terminating court supervision of the Children because Mother and Father obtained adequate housing, rent was current, and they consistently had negative drug screens. The Children's school attendance was improving, as well.

In January 2022, the Agency received a report Mother and Father may be living with the Children at a local motel. There were also concerns about a possible physical alternation between Mother and Father. The Agency's Caseworker, Amy McGill, confirmed the family was living in a motel and searching for appropriate housing. Ms. McGill testified Children's needs were being

7

met, despite living in the motel, and Mother and Father were seeking housing support from the community. The youngest of the five (5) siblings was born ███████████. A week later on March 17, 2022, there was a CPS report one (1) of the Children sustained an eye injury. Mother and Father reported the oldest Child fell off his bike. Upon investigation, the Agency determined the CPS report unfounded.

Later in 2022, there was another CPS report concerning N. I. losing too much weight and another younger sibling, L.I., presenting at the local Head Start childcare facility with a Suboxone wrapper in her backpack. Mother and Father said N.I.'s stomach illness and vomiting were the cause of his weight loss. After investigating the Agency concluded the Suboxone wrapper incident was valid, despite Mother and Father asserting they utilized a lockbox in their home for safekeeping medications.

On July 11, 2022, the Agency, again, became involved with the family when the Adams Township (Butler County) Police Department contacted the Agency concerning the three (3) of the Children left unattended in the residence.[4] The Officers determined these children were left alone for approximately two (2) hours without any adult or appropriate caregiver present. Adams Township Officer Jose Ceron testified it took Mother and Father over one (1) hour for them to return home, after a child, B.I. called his parents to inform them the police were at the residence. However, when he was on the phone with Mother and Father, they told their son they were, "...turning on the street now." Officer Ceron smelled marijuana within the home, along with finding suspected marijuana found within reach of the Children. The police took Father into custody, while the Agency placed the Children with the Maternal Great-Grandmother, ████████ ████ Mother and Father were charged with felony endangering the welfare of children. A

---

[4] At the time, these Children were B.I., age 9; L.I., age 5; and N.I., age 3.

search warrant was issued and, upon searching the vehicle after it arrived home, the police discovered several prescription bottles with one (1) bottle containing evidence of crack cocaine. The investigating officers also determined there was inadequate food in the home.

On the following day, an order detaining the Children was entered, due to these safety concerns, including, but not limited to the unavailability of Mother and Father. On July 13, 2022, the Agency filed the Petition for Dependency and application for shelter care. Sufficient evidence was presented to establish a return of the Children to their home with Mother and Father was unsafe. Hearing on the Agency's Petition was scheduled on July 27, 2022. Prior to the hearing, the Agency filed an Amended Dependency Petition, addressing additional concerns, such as the older Children's poor school attendance and insufficient health care.

Prior to the July 11, 2022 incident involving the police, one (1) of the Children, N. I., was having breathing difficulties and weight gain issues. Mother and Father were advised to take him to Children's Hospital of Pittsburgh, which they failed to do. The following day, N. I. was transported by ambulance and admitted to Children's Hospital. Mother and Father later signed-out the boy from the hospital against medical advice. The health issues involving N. I. later resolved. However, all of the Children missed various health care appointments. For example, the Agency's assigned Caseworker attempted to have authorizations signed by Mother and Father to release dental care information. Mother informed the Caseworker there was no identified dental provider for the Children.

Mother and Father arrived approximately 20-25 minutes late to the Detention hearing held on July 27, 2022. Counsel for Mother and Father requested a full evidentiary hearing regarding the dependency allegations. Due to the Hearing Officer's schedule, there was insufficient time to conduct a lengthy hearing, so it was rescheduled to August 12, 2022. However, some testimony

9

was received on July 27, 2022, regarding the Agency's request to modify the Children's placement. The Agency alleged Mother, who was required to be supervised with the Children, was unsupervised, when she took the Children to a medical appointment. There were additional safety concerns how the Children and Mother were transported to the appointment. Placement of the Children was modified by removing them from Maternal Great-Grandmother's care and placing the Children into foster care.

At the August 17, 2022, Adjudication hearing, the evidence established Father faced three (3) felony child endangering charges and five (5) misdemeanors arising from the July 11, 2022 incident. Soon thereafter, he was also charged for a somewhat related incident occurring on August 8, 2022, comprised of two (2) felonies and two (2) misdemeanors, where Father threatened a neighbor near the apartment rented by the Mother and Father. Mother was charged with two (2) felony endangering charges, three (3) misdemeanors, and a summary offense arising from the incident on July 11, 2022. Father was incarcerated in the Butler County Prison with bail set at $100,000.00. At the Disposition hearing held September 14, 2022, the continued placement of the Children was ordered with Mother entitled to supervised visitation twice a week, since she was not incarcerated. Father was granted visitation, contingent upon his release from jail. A PRH on December 14, 2022. On or about November 1, 2022, the Agency requested a placement change to allow all five (5) children to remain together in foster care.[5]

At the December 14, 2022 PRH, it was determined continued placement of the Children was in their best interests. Father remained incarcerated. On the other hand, Mother was making moderate progress toward alleviating the circumstances necessitating the original placement. She maintained a residence in the █████████████████ located in southern Butler County and

---

[5] Mother and Father gave birth their fifth child ██████████████████

10

was able to drive a suitable vehicle for transporting the Children. Mother was also working full-time. An early PRH was scheduled for February 2, 2023.

By Order dated December 22, 2023, Mother received supervised visitation on Christmas Day from 10:00 a.m. until 8:00 p.m. at the Foster family's home, so long as she submitted to a drug screen on that day. Additionally, Mother was granted supervised visitation time in her home on weekends, at times to be agreed upon between the Agency and Mother's counsel. The next PRH was scheduled on January 19, 2023 and later cancelled, upon the Agency's motion.

On February 1, 2023, counsel for Mother filed a Motion for Continuance of Early Permanency Review Hearing scheduled on February 2, 2023. An Order was entered granting Mother's request continuing the PRH to March 8, 2023, primarily to allow the Agency and Mother to evaluate her progress exercising extended visitations.

At the March 8, 2023, PRH, the evidence supported continuing placement of the Children in Foster care. Father remained incarcerated. Mother was deemed to be substantially complying with the goals outlined by the Agency. Another review hearing was scheduled on March 24, 2023.

The Agency's Caseworker conducted a home visit on March 15, 2023 and was informed by one (1) of the Children that an individual known as "Uncle Miz" had "grabbed up on him." At the time, Mother had unsupervised custody of the Children at Maternal Grandmother's home every weekend. Mother claimed she does not allow anyone around the Children. Upon further inquiry, the Agency discovered "Uncle Miz" was ███████████ who was under close surveillance by Federal Marshalls. On or about April 12, 2023, the Agency petitioned for an early review hearing, due to concerns with some adult being around the Children, during Mother's visitation.

At the early PRH held April 27, 2023, the evidence indicated Mother was exercising poor judgment with certain adults she allowed to be in contact with the Children. Mother was prohibited

to have anyone be in her home when having overnight visitation of the Children, unless she Agency gave approval after it conducted criminal background checks. The next PRH was scheduled on June 28, 2023.

On June 7, 2023, one (1) of the Children requested that, "Terrance" [Clowney] wouldn't come around anymore." The Agency determined Federal Marshalls were also searching for Mr. Clowney because a warrant was issued for his arrest. Mr. Clowney frequented Mother's residence on several occasions. He was apprehended to face drug-related charges.

Later in June 2023, the Butler County Drug Task Force arrested and charged Mother with felony drug charges involving fentanyl distribution, as well as a misdemeanor drug paraphernalia charge. Maternal Great-Grandmother, who previously served as kinship placement for the Children was present during some of Mother's drug dealing. A search warrant of Mother's cellphone further revealed Maternal Great-Grandmother was fully aware of Mother's illegal drug activity. The search of Mother's cellphone also revealed an incident of a third-party trying to buy a bundle of fentanyl from Mother on June 28, 2023. Mother text message reply stated, "give me a second I have my kids."

At the PRH held July 19, 2023, Father remained incarcerated. Mother tested positive for cocaine and continued her association with known drug-related persons. Mother underwent ongoing drug screens twice per week and hair follicle testing. Mother's court-appointed attorney requested a continuance of the October 11, 2023, PRH, because she had a previously scheduled vacation, but then fell ill with COVID-19. An Order granting the continuance request was entered and the PRH was re-rescheduled to October 26, 2023.

Father was still incarcerated at the time of the October 26, 2023, PRH. Mother was minimally complying with the Children's Permanency Plans. She was not communicating with

12

the Agency and also had outstanding criminal warrants. The Children remained placed in Foster care.

On October 24, 2023, the Agency filed the within Petitions to involuntarily terminate the parental rights of the Children's birth parents. The evidentiary hearing on the IVT petitions was scheduled for April 24 and 25, 2024.

On February 2, 2024, the Agency filed its Motion for Goal Change from reunification to adoption. The Court entered an Order on February 7, 2024, scheduling an evidentiary hearing on the Motion for Goal Change on April 24 and 25, 2024.

The next PRH was held February 21, 2024. Mother and Father were incarcerated, the latter since the July 2022 incident involving three (3) of the Children left unattended in the home without supervision, insufficient food, marijuana within their reach, and intimidating witnesses. The Children's continued placement in Foster care was ordered because their parents were making no progress toward eliminating the dependency circumstances. Despite being entitled to visitation rights, while in the Butler County Prison, efforts to reunify him with the Children and to achieve the goals under the C PP was difficult. On January 2, 2024, Father was transferred from the Butler County Prison to the SCI - Quehanna Boot Camp, where visitation was prohibited.

Another PRH was held April 24, 2024. Mother and Father remained incarcerated: Mother at the Butler County Prison and Father at the SCI-Quehanna Boot Camp. The Children continued in Foster care placement. Mother and Father were found to minimally complied with the Agency's plan, due to their incarceration. The Court noted the Children were thriving pre-adoptive Foster placement because all their needs were being met.

A subsequent PRH was scheduled for May 16, 2024. The Agency requested a continuance, asserting the dependency case was "status quo," pending the outcome of the Agency's five (5 IVT)

13

Petitions. Counsel for Mother and Father, along with the Children's court-appointed GAL, consented to the Agency's request and, by Order entered on May 16, 2024, the PRH was rescheduled to October 10, 2024.

On June 19, 2024, the Agency filed its Motion to Suspend Natural Mother's Visitation, alleging she participated in Zoom virtual visitations with the Children from the Butler County Prison and included Father, Maternal Grandmother, and Maternal Great-Grandmother by utilizing her Zoom log-in information. Mother was cited for violating the Prison's Inmate Phone/E-Messaging Policy because she shared the Zoom Meeting ID and Access Code with outside individuals. By Order of Court dated June 18, 2024, Mother's visitation was suspended, pending further Order of Court.

On August 27, 2024, the Court entered an Order directing the Butler County Clerk of Courts to docket Father's Petition to Permit Father's Visitation because he was released from Quehanna and residing in a halfway house in Allegheny County, Pennsylvania. By separate Order dated August 28, 2024, the Court scheduled a hearing on Father's Petition requesting some form of visitation.to be heard on November 4, 2024.

On the Court's motion, an Order was entered October 1, 2024, cancelling and consolidating Father's Petition to Permit Visitation with the Permanency Review Hearing scheduled to be held on October 17, 2024[6] before the Juvenile Court Hearing Officer. On or about November 6, 2024, the Court received the Juvenile Court Hearing Officer's Recommendation stating counsel for the Children's parents request the matter be heard by the Court.

Hearing on Father's Petition to Permit Visitation as well as a PHR were held before this Court on November 22, 2024. His request for visitation was denied.

### IVT Testimony

Barry Jones of Justice Works testified that, from August 2022 through October 2023, Justice Works coordinated supervised visitations between Mother and the Children, who were

---

[6] The PRH was originally scheduled for October 10, 2024 via the Agency's Motion to Continue. However, due to unavailability of the Court, the PRH was rescheduled for October 17, 2024. (See, Hearing Officer's Recommendation filed November 6, 2024)

14

placed in a Foster care family in Crawford County, Pennsylvania. These visits were scheduled every Thursday, despite problems with Mother usually arriving late. The Children showed affection toward Mother at these supervised visits. Arrangements were made by the Agency with the Butler County Prison for Father to have telephone contact with the Children. In late December 2022, Mother's supervised visits progressed to monitored visitation with increased frequency to twice each week for a few hours each visit. There were occasional visits held in Mother's home. The Agency provided Mother with gasoline cards to financially help with travel from Butler County to Crawford County. At times during Mother's visitation with the Children, Mr. Jones overheard her occasionally using foul language and stating ultimatums to the Children. She also failed through with promises made to the Children.

Joel Zacherl, who works at the Butler County Prison, testified inmates are offered voluntary rehabilitation programs, but inmates must first enroll to participate. After Mother was incarcerated in August 2023 on drug charges, she did not participate in any rehabilitation programs. From July 2022 until he was transferred to a state correctional facility on January 2, 2024, Father failed to enroll in any rehabilitative programs. Mr. Zacherl indicated Father was placed on restricted status for disciplinary reasons, which prohibited his ability to enroll in these programs.

Mother attended Crossroads Treatment Center for drug addiction treatment from 2019 through December of 2023. She received medication management and prescribed Suboxone by injection. Mother has never been discharged for non-compliance. Mother was compliant with treatment but, since is presently incarcerated in the Butler County Prison, she cannot maintain treatment through Crossroads. Upon release from incarceration, Mother will be required to re-enroll to resume drug addiction treatment.

15

Emily Pasquarello of the Bair Foundation was contacted by the Agency to undertake weekly trauma focused therapy for the older Children. On March 27, 2024, she reported to ChildLine of alleged physical abuse of B. J. I., Jr. and his younger sister, L. I., at the hands of Father. Ms, Pasquarello did not prompt either Child. Rather, when these Children were asked about actions and consequences, B. J. I., Jr. volunteered L. I, was whipped by Father with an extension cord. B. J. I., Jr. also reported Father pushed his pinky finger, until he cried, and later pushed him up against the wall. Ms. Pasquarello made another ChildLine report on April 16, 2024, reporting Mother allowed B. J. I., Jr., and his younger brothers. P. I. and N. I., to experiment using vape. These Children found the vape on the side of the road, which Mother was aware. She laughed about it, even when N. I. had the vape in his mouth. Ms. Pasquarello indicates the Children are doing very well in the Foster home and participating in many activities (Exhibits 4 through 11).

Madison Oakes is a Permanency Specialist with the BAIR Foundation. Specific to these Children, she is performing child preparation services consisting of ten (10) sessions spanning six (6) months. Upon completion of the program, each Child becomes excited when viewing a "Life" book containing photos of Mother and Father. Ms. Oakes reports the Children all get along well with each other and struggle to be serious, often singing songs together. There is nothing unusual or extraordinary occurring during the sessions. Permanency was not discussed by Ms. Oakes with the Children.

Taylor Semko, who is also a Permanency Specialist with the BAIR Foundation, started the child preparation assignment in September 2023. She discussed permanency and the adoption process in an age-appropriate level to the Children, explaining it is a "forever thing."

16

Testimony was received from another BAIR Foundation employee, Julie Vipp, who is a Foster Care Specialist, indicating the Children were placed in the Foster home on October 27, 2022. She opines they are well-bonded with both foster parents and interact well with them. Ms. Vipp describes the home as "very neat" with the older boys sharing a bedroom and their younger sisters also sharing a bedroom. The pre-adoptive father is employed, while the pre-adoptive mother stays home tending to the Children daily needs. There are no safety concerns and the older Children say they want adopted.

Agency ongoing Caseworker Rachel Wettick received assignment to the dependency case on August 2, 2019, after the Children were adjudicated dependent on July 24, 2019 and placed with the Paternal Aunt, Channel Irvin. In general, the CPP provided Mother to be sober, stabilize her mental health, and receive parenting instruction. Father was released from incarceration related to the probation violation on December 10, 2019 and went directly to inpatient treatment for drug addiction. During the height of the COVID-19 Pandemic from roughly March through May 2020, there were difficulties for Mother and Father to participate in services, except participating in virtual services. On December 3, 2020, the Children were returned to Mother and Father. The primary caregiver upon reunification was Father because Mother worked outside the home. The Agency closed the dependency case in July 2021.

Michael McConnell, who is the Butler County Adult Probation Officer supervising Mother's house arrest. She was sentenced on September 23, 2023, after entering a guilty plea to the Walmart theft incident. Mother failed to appear on October 17, 2023 for installation of an electronic monitoring device. She appeared October 20, 2024 at Butler County Adult Probation to have the device hooked-up. On November 11, 2023, Mother was arrested and charged with felony intent to deliver drugs and other misdemeanors. She was placed in the Butler County

17

Prison. Mother appeared with counsel on both days of the IVT hearing, after being brought from prison by the Sheriff's Department.

The Agency presented further testimony from Intake Caseworker Amy Magill. On January 25, 2022, Ms. Magill received a CPS report concerning the eviction of Mother and Father from their home and were living in a motel in Cranberry Township, Butler County. After further investigation, this CPS report was validated, due to homelessness, domestic abuse, and drug use by Mother and Father. Ms. Magill also discovered the two (2) younger siblings were not attending school.

There was a second CPS report on March 17, 2022 involving an eye injury sustained by the oldest Child, B.J.I., Jr. Ms. Magill met with him in the home. She was told by the Child he fell from his bicycle, while staying with the Maternal Great-Grandmother. This CPS report was unfounded.

Ms. Magill received a third CPS report on May 16, 2022, due to concerns one (1) of the Children, N.I. was losing weight and another Child, L.I., had a Suboxone wrapper in her backpack at pre-school. The third CPS report was validated.

The Intake Supervisor for the Agency, Eric Stover, while on-call the evening of July 11, 2022, received a call from the Adams Township Police Department. The police were called to the residence of Mother and Father and discovered three (3) of the Children left unattended. Mother and Father were taken into police custody with Father placed in the Butler County Prison. Mr. Stover observed a chaotic scene, when arriving to the residence at approximately 5:30 p.m. He smelled the odor of marijuana inside the home. Mother admitted to Mr. Stover the Children were left alone for about two (2) hours because she, Father, and Maternal Great-Grandmother drove the newborn, N.I., to a doctor appointment, which was cancelled. All the Children were initially

18

placed with Maternal Great-Grandmother. They were subsequently removed from her home and placed in two (2) Foster homes. Prior to placing the Children outside their home, the Agency unsuccessfully attempted to place them with the Maternal Aunt, who resisted placement. She previously provided placement care of her nieces and nephews. In addition, Mr. Stover requested Mother and Father take urine screens for suspected drug use, which they refused. He also determined the Children were not attending any medical or dental appointments.

On January 2, 2024, Father was transported from the Butler County Prison to the State Correctional Institution at the Quehanna Boot Camp ("Quehanna"). Douglas Twigg, who is a Corrections Intake Counselor, testified Father qualified for acceptance into Boot Camp. The State Drug Treatment Program (STOP) proved Father with intensive drug rehabilitation treatment through successful completion of specific program, including therapeutic community and violence prevention, followed by 60 days of inpatient rehabilitation, then release to a recovery home in the community with outpatient treatment. Mr. Twigg indicated Father's earliest possible release date from Boot Camp is June 5, 2024.

Quehanna Corrections Counselor Krista Modzel testified Father received no "formal" misconduct incidents "written-up", while at Boot Camp. She indicates Father requested to be wait-listed for enrollment in parenting sessions called "Inside/Outside Dad." Ms. Modzel testified Father was denied visitation with the Children in accordance with Boot Camp policy, including no entitlement to video visits. He was sending the Children letters and cards, after first screened by Boot Camp personnel. The Agency permitted the Children to correspond with their father.

Adams Township Police Officer Jose Ceron testified on the second day of the IVT hearing regarding the July 11, 2022 incident when Mother and Father left three (3) of their children unattended at home. After arriving to the home at 3:30 p.m. nd knocking on the door, Officer

19

Ceron was greeted by a young child. Upon entering through the front door, he observed other young children and no adults present. In plain view of the officer, and easily accessible to the Children, were marijuana "blunts." The Agency was alerted to the situation. The oldest Child, B.I., Jr., used his cellphone one (1) of his parents. Officer Ceron testified Mother and Father failed to return home after approximately an hour from the time B.I., Jr. contacted them.

Father was taken into custody by the police because he and Mother became very agitated and aggressive. The Children said they were hungry. Officer Ceron, along with backup Officers Ging and Murrick, observed a lack of food in the home. A valid search of the vehicle Mother and Father were using uncovered a prescription bottle containing crack cocaine. Separate felony and misdemeanor charges were filed against Mother and Father.

Butler City Police Officer Ryan Doctor, who is involved in the county drug task force, was investigating Mother. On June 28, 2023, she was arrested for distributing fentanyl (Children's GAL Exhibit 1).

Father testified on the third day of the IVT hearing. He is still married to Mother, but they are not an intact couple. He believes they are "trying to work things out." When Mother was working, Father served as the Children's primary caregiver, until incarcerated in 2019 and the Children placed in kinship care. Father was released from jail in December 2020 and the Agency closed the dependency case. Father detailed the numerous residences he and Mother rented, including apartments in ███████████████████████████████ ███████ located in southern Butler County.

While incarcerated in the Butler County Prison for 16 months, Father had weekly video visits for 10 to 15 minutes with each Child, beginning with the oldest, B. I., Jr. to the youngest son, N.I. When he entered the state correctional system at Smithfield, followed by Quehanna,

visitation was prohibited. Father sent two (2) letters to the Children, one (1) of which was deemed inappropriate and not forwarded to them because it contained false promises.

Father indicates learning so much in the Quehanna Boot Camp Program. He participates in individual and group counseling sessions, attends an early morning meeting, leads the "Energizer Group" to motivate fellow Boot Camp enrollees, and is involved on other activities focusing upon successful rehabilitation. His "clean date" is July 11, 2022, which is the day he and Mother left three (3) of their young children unattended for roughly two (2) hours. Father believes if he is eventually reunified with the Children, then they will not suffer any negative emotional impact.

Father's criminal history dates to 2006, when he was age 18. From age 18 until he was 25 years old, Father was incarcerated in the state correctional system. He was diagnosed with bi-polar disorder at age 15 or 16 and placed on prescribed medication. Father began using illegal drugs at age 27 or 28, starting with using marijuana then moving on to crack cocaine and heroin. He does not take Suboxone. Father says he feels better and no longer gets easily aggravated, as in the past. Father also suffer from blood clots. He receives Social Security Disability when not incarcerated.

Father feels the Children do not fully understand the termination of parental rights and adoption processes because they are being explained in a one-sided manner. He offered no evidence to support this assumption.

When he is released from the state correctional system, there will be supervisory "eyes" on Father with follow-up counseling, medication checks, and random urine tests three (3) times each week. If there are no setbacks along the way and "all goes well," Father will be free of supervision in August 2025.

21

Father denies committing any domestic violence, claiming he never put a hand on the oldest child, B. I., Jr. Father's testimony is not credible. Surprisingly, Father showed no indications of remorse or regret about the circumstances leading up to the Agency's request to terminate his parental rights.

Mother, who is facing serious criminal charges, did not testify. The Children's GAL requested the Court apply a negative evidentiary inference.

The first witness to testify at the IVT proceeding called by the Agency was Dr. Eric Bernstein, who performed the Parental Assessment of Mother and Bonding Assessment. Counsel for each Parent, the court-appointed GAL, and the Agency's Solicitor stipulated to his qualifications as an expert to perform both assessments. His reports were admitted into evidence without objection (Exhibits 2 and 3).

Due to technical issues caused by Father's incarceration, he was unable to be interviewed by Dr. Bernstein. Mother was scheduled to meet with Dr. Bernstein on September 20. 2023 for the parental capacity evaluation and on October 26, 2023 for the bonding assessment. These meetings did not occur, as scheduled, due to Mother's incarceration in the Butler County Prison. She met with Dr. Bernstein on February 16, 2024.

Mother self-reported to Dr. Bernstein having two (2) prior mental health commitments. She has prior diagnoses of PTSD, major depressive disorder, and bipolar mental health illnesses. Mother also admitted an addiction to drugs. She further reported her criminal history and past domestic violence Mother attributes to having made poor relationship choices in the past.

Dr. Bernstein concludes Mother's legal issues, drug addiction, and poor mental health all negatively impact upon her parenting capacity. Dr. Bernstein noted presented as very defensive,

22

placing blame for the Children's pre-adoptive placement on Agency Caseworker Paige McCracken.

## LEGAL STANDARD

The underlying grounds for involuntary termination of parental rights asserted by the Agency against Mother and Father are set forth under Section 2511(a), Title 23 of Pennsylvania Consolidated Statutes, which provide in pertinent part, as follows:

Grounds for Involuntary Termination

(a) General rule. The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

    (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

    (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused Child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

    (5) Child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of Child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of Child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of Child.

    (8) Child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of Child continue to exist and termination of parental rights would best serve the needs and welfare of Child.

23

(b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of Child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1 ), the court shall not consider any efforts by the parents to remedy the conditions described therein, which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa. C. S. § 2511.

The Pennsylvania Supreme Court stated, "...it is well-established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination." *In re E.D.M., 708 A.2d 88, 91 (Pa. 1998).*

> The court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 251 1 (a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 251 1 (b): determination of the needs and welfare of Child under the standard of best interests of Child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on Child of permanently severing any such bond.

*In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007).*

Termination may occur based on any one of the listed subsections. *In re Adoption of R.K. Y., 72 A.3d 669, 671 (Pa. Super. 2013).* Once statutory grounds for termination of parental rights have been met, the Court must then consider whether termination serves the needs and welfare of Child.

## LEGAL ANALYSIS

The Court fully recognizes a parent's incarceration, standing alone, does not form the legal basis for involuntarily terminating parental rights to a child. The Agency presented significant

credible evidence for the Court to consider whether any of the four (4) statutory grounds for involuntary termination asserted by the Agency is established by clear and convincing evidence.

**(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.**

The Agency established, by clear and convincing evidence, that the factors of 23 Pa. C.S. § 2511 (a)(1) are met to terminate both Father's and Mother's parental rights to each of their five (5) children. The facts indicate by clear and convincing evidence Mother and Father fail to perform even minimal parental duties on behalf of each Child. Since mid-2019, when N.I. a.k.a Baby Girl was born addicted to drugs, Mother and Father have been subjects of juvenile dependency oversight. Mother and Father have serious drug addiction and mental health issues The Agency established by clear and convincing evidence neither Mother nor Father have taken appropriate steps to address these troubling issues, including, but not limited to refusing helpful service for most of the entirety of the dependency proceedings.

Father has been incarcerated for basically the entirety of the dependency actions. Mother has been in and out of jail and, when she is not incarcerated, Mother minimally complied with treatment to achieve the Agency's reasonable goals.

Both Mother and Father, while indicating a strong desire to continue parenting their children, but completely fail performing the parental duties. The result seriously jeopardizes the health, safety, and welfare of each Child. Each Parent made slight progress throughout the placement of the Children in Foster care. However, any parenting progress was followed by subsequent periods of dangerous regressions, such as leaving the Children unattended for two (2) hours and Mother getting arrested in 2023 for dealing fentanyl.

25

Neither Mother nor Father can swoop in at the eleventh hour and assert they are now willing to follow the Children's Service Plans. The Court must look to the Children's best interests, which is to be adopted by their pre-adoptive parents, and not to remain in placement with no stability or permanency, on a wishful whim their parents will change criminal and otherwise destructive parenting behaviors.

The actions and inactions by Mother and Father, as extensively detailed above in the Findings of Fact, indicate by clear and convincing evidence that Mother and Father have evidenced a failure to perform parental duties in excess of the six months, thus satisfying the requirements as set forth under 23 Pa. C. S. §2511(a)(1).

**(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused Child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.**

Likewise, the Agency has shown by clear and convincing evidence the parental rights of both Father and Mother should be terminated under 23 Pa.C.S.A. 2511(a)(2). The fundamental test of termination of parental rights under Subsection(a)(2) requires that the Agency prove:

> (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused Child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Geiger, 331 A.2d 172 (Pa. 1975).*

The Children were initially adjudicated dependent, in part, due to an incident occurring at the residence of Mother and Father when they abandoned three (3) of their children, leaving them alone and unattended for approximately two (2) hours on July 11, 2023. The Adams Township Police Department responded to the home and found marijuana "blunts" and other drug paraphernalia within reach of the young Children. After Mother and Father returned home and a

26

warrant to search their vehicle was obtained, the police discovered crack cocaine in a prescription container.

Again, Mother and Father disregarded the requirements under each Child's Permanency Plan by either taking minimal steps or no actions to follow the Agency's recommendations to achieve reunification. Their non-compliance was consistent with living a drug addiction lifestyle of criminal activities and consequential incarcerations. Mother and Father generally shunned rehabilitation efforts and mental health treatment, all at the expense of the Children.

While Father is released from incarceration and living in a step-down rehabilitation home, Mother is currently incarcerated in a state correctional facility on a lengthy sentence for dealing fentanyl. Despite being released from incarceration, Father must successfully complete further outpatient treatment before achieving full integration back into the community. Father's track record is poor, at best.

**(5) Child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of Child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of Child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of Child.**

The Agency also established by clear and convincing evidence the conditions giving rise to the removal or placement of the Children continue to exist, the parents cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal, or placement of Children within a reasonable period of time and termination of the parental rights

27

would best serve the needs and welfare of Child. The fundamental test of termination of parental rights under subsection 5 of 2511 requires the Agency to show that:

> (1) Child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of Child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of Child.

*In re K.Z.S., 946 A.2d 753, 754 (Pa. super. 2008).*

Where conditions that led to removal or placement continue to exist and a parent cannot or will not remedy the conditions within a reasonable time, termination is appropriate. *In re Involuntary Termination of Parental Rights 10 D.B.J., 160 A.3d 246 (Pa. Super. 2017).* (concluding that termination was appropriate where Father did not comply with the reunification plan, met none of the family service plan goals, and demonstrated an incapacity to perform parental duties).

As the Findings demonstrate, the services offered to Mother and Father by the Agency were not utilized to sufficiently remedy the circumstances leading to the Children's removal and pre-adoptive placement. The Agency established by clear and convincing evidence that each Child's health, safety, welfare, and overall best interests will be served by terminating the parental rights of their natural parents. Moreover, even if Mother or Father were to continue using services and utilize those services reliably, they could not remedy the circumstances within a reasonable time.

The Children were placed the Court, since July 12, 2022, and continue to remain in placement. Clearly, more than six (6) months elapsed. All five (5) of them are safe and secure under the loving roof of pre-adoptive parents. Each Child is thriving. The Foster family is faithfully and diligently utilizing the services offered to them by the Agency for the betterment of the Children and to help them understand the process.

28

**(8) Child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of Child continue to exist and termination of parental rights would best serve the needs and welfare of Child.**

The Agency established by clear and convincing evidence the Children were removed from the care of a parent, more than 12 months have elapsed from the date of removal or placement, the conditions which led to the removal or placement of Child continue to exist, and termination of parental rights will best serve the needs and welfare of Child.

Termination under this Subsection does not require evaluating whether a parent is willing or able to remedy the conditions that led to placement; it only requires that the conditions exist "after the twelve month period has elapsed," recognizing that a child's life cannot be held in abeyance while a parent is unable to perform actions necessary to assume parenting responsibilities. *In re Adoption of R. K. Y., 72 A.3d at 671* (addressing facts where a mother was unable to refrain from using drugs and alcohol, participate in mental health treatment, and secure employment and housing, despite initially making progress).

Courts may not consider any effort by a parent to remedy the conditions described in Subsection (a)(8), if that remedy was initiated after the parent was given notice that the termination petition had been filed. *In re Z.P., 994 A.2d at 1112.* A court may consider post-petition efforts if the efforts were initiated before the filing of the termination petition and continued after the petition date. *Id.* The post-Petition efforts by Mother and Father to remedy the conditions leading to removal and placement are minimal, primarily due to thumbing their noses at the Agency's reasonable efforts toward reunification, illegal drug use and serious criminal

29

activity, and incarcerations. Little consideration is given to the token post-Petition efforts by either Parent.

Services were offered to Father, which he failed to adequately utilize. Because Father did not take necessary steps remedy the circumstances which led to each Child's removal, the Agency established, by clear and convincing evidence, that it would serve Children's needs and welfare to terminate Father's parental rights. It has been almost two (2) years, since the initial detention.

Similarly, it has been well over 12 months since Children's removal from Mother's care and the conditions which led to their removal still exist. Initially, Mother was making legitimate progress, complied with the Agency's Service Plan, and even had Children returned to her care for extended visitations over weekends. Despite her initial progress, Mother seriously stumbled by facing a pending felony charge for allegedly dealing fentanyl. Her attempts to remedy the dependency circumstances causing the Children's removal failed on all fronts. Mother is unable change her lifestyle away from continued involvement with illegal drugs, whether using or selling.

As the Findings demonstrate, the many services offered to Mother were not effectively utilized by her to remedy the circumstances leading to the Children's removal. The Agency by eliciting credible testimony from numerous witnesses established, by clear and convincing evidence, that it serves the Children's needs and welfare to terminate Mother's parental rights. Moreover, even if Mother were to continue using services and start using them reliably, she could not remedy the circumstances within a reasonable time

> **(b) The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of Child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be**

**beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(l), the court shall not consider any efforts by the parents to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.**

First and foremost, the Court gives primary consideration to the needs and welfare of these Children in rendering its decision. With respect to Section (a)(l ) and (a)(8), the Court is not considering any efforts by Mother and Father to remedy the conditions described therein which were first initiated subsequent to the giving of notice of the filing of the petition. However, the Court is considered this evidence under the other sections, as may be appropriate.

"In a case involving the termination of parental rights, the trial court is required to consider whatever bond may exist between Child and parent, as well as the emotional effect that termination will have upon Child." *In re Adoption of A.C.H., 803 A.2d 224, 229 (Pa. Super. 2002).* This Court recognizes that a strong, positive bond existing between a child and parents must give rise to careful reflection before granting involuntary termination because some harm may result from severing parental bonds with their child or children.

Credible testimony was presented by the individuals from the BAIR Foundation indicating the Children are well-adjusted in the pre-adoptive Foster home in Crawford County, which began on October 27, 2022. They are excited to see their Foster parents and their extended family. Foster Mother is a stay-at-home mother, while Foster Father works outside of the home. The Foster family has not requested any additional services or assistance from the Agency. The four (4) older Children say they want to be adopted and remain in the Foster home.

All of the Children are very connected to one another. The older boys refer to the Foster home as their "dream home." However, the Children mention supportive family members, such

as "Grandma Tony" ███████████ Madison Oakes of the BAIR Foundation indicates the Children sometimes struggle finding total happiness with Foster family, but also do not want to say anything bad about Mother and Father. Ms. Oakes believes the Children experience some guilt both with placement and being happy in placement.

It is no surprise the Children remain somewhat bonded with Mother and Father, who each express genuine love and affection for their children. However, "...the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M., 71 A.3d 251, 267 (Pa. 2013)*. Ongoing stability, continuity, and permanency are critical to the health and welfare of dependent children and must take priority.

The Children's need for safety, stability, and permanency clearly outweigh any potential harm to the Children from the severing their bond with Mother and Father. These Parents demonstrated very little conscious effort to ensure the safety and wellbeing of their children. Father remained incarcerated during the entirety of the dependency proceedings and Mother has been in and out of jail during the proceedings. She also is facing some serious drug related charges.

The Children have been involved with the Agency for more than two (2) two years. They safe, secure, protected, and stable, above all else. *In re SB., 943 A.2d 973 (Pa. Super. 2008)* is instructive where the inability or unwillingness of a mother and father to remedy drug and alcohol abuse problems, cause it to be in the best interests of their child to have ,the parental rights terminated, so the child can find safety, permanency, and stability.

The Court regrettably recognizes these Children may suffer some grief and loss with the termination of parental rights of Mother and Father, which will extinguish the relationship with Mother's extended family members. However, after providing opportunities for successful

32

reunification, the Court must ultimately be especially keen to the Children's best interests by ensuring a safe, stable, and permanent home for them, free from their parent's self-destructive lifestyles.

Therefore, the parental rights of Mother and Father to their five (5) minor children shall forever be terminated.

The Decree of Termination shall be issued: